## 19796

Mamie Lee WRIGHT, Respondent, v. PUBLIC SAVINGS LIFE
INSURANCE COMPANY, Appellant
(204 S. E. (2d) 57)

*James A. Stucky, Jr., Esq.,* of Charleston, *for the Appellant,*

*Richard E. Richards, Esq., of Richards, Caskey & Richards,* of Lancaster, *for Respondent,*

April 1, 1974.

*Per Curiam:*

In this action the plaintiff-respondent sought to recover actual and punitive damages for the allegedly fraudulent cancellation of certain insurance policies by the appellant-insurer, allegedly accompanied by a fraudulent act or acts. The jury returned a verdict in her favor for $600.00 actual damages and $1,700.00 punitive damages. The insurer appeals from the denial of its after-verdict motions.

While appellant's exceptions are 14 in number, only three questions are stated and argued and actually two of them constitute only one question to wit: was there any evidence of a fraudulent act accompanying the insurer's breach of its contract, which would support the recovery of punitive damages. The insurer apparently tacitly concedes that the judgment against it for actual damages is warranted by the evidence, but contends that it was entitled to a directed verdict as to punitive damages. In considering this contention it is elementary that the evidence and all inferences reasonably deducible therefrom have to be viewed in the light most favorable to the respondent-plaintiff. We proceed to review the evidence and state the facts in the light of such principle.

The plaintiff—Mamie Lee Wright is a resident of Lancaster, South Carolina; a person of limited education and 61 years of age at the time of the trial of this case in September, 1972. About May, 1963, she acquired from the insurer a life policy and a health and accident policy, the premium on one being 99¢ per week and the premium on the other being 60¢ per week. In 1964 she made a claim under the accident and health policy, which was paid in part, and again in 1970 she had occasion to make a claim thereunder because of illness with hypertension. In the early part of 1971, Mamie Lee was employed, apparently as a domestic or at odd jobs, working on several different jobs, and frequently getting home late at night. As a result, she and the agent collecting the debit for the insurer had some difficulty making contact, upon which Mamie Lee started making part of her premium payments at the Lancaster office of the insurer. Whenever she paid at the office she was given a temporary, conditional premium receipt, which later would be picked up by the debit agent when she was given credit by the agent for the payment on her premium receipt book. The agent on plaintiff's debit was one Shannon, who left the employment of the company on April 24, 1971, being succeeded by one Hunter.

On May 3, 1971, the Lancaster office reported to the home office of the insurer in Charleston, South Carolina, that both of Mamie Lee's policies were lapsed for non-payment of premiums. There is abundant evidence to the effect that neither of Mamie Lee's policies were subject to lapse for non-payment as of that date. In addition to payments made to the debit agent, it is undisputed that she made the following payments to the Lancaster office: on April 15, the sum of $3.50 and on April 22 a like sum. It should be noted that the sum of $3.18 would pay the premiums on both policies for a period of two weeks. Subsequent to May 3, Mamie Lee paid at the office the sum of $10.15 on May 13, and the sum of $3.50 on May 19. On May 28, 1971, the manager of the Lancaster office informed Mamie Lee that both of her policies had been lapsed for non-payment of premiums, upon which she responded "my insurance has lapsed, as many times as I've been coming up here paying my insurance * * * My Lord, I have to work too hard to be treated like this." The response of the manager was merely "you are getting too old anyhow." She was then tendered the sum of $6.36 by way of refund and requested to sign a receipt, which she declined to sign and instead consulted counsel.

On May 13, the day that Mamie Lee made a payment in the amount of $10.15, a Multiple Revival Application was prepared without her knowledge, at least inferentially by the debit agent Hunter, which purported to apply for the revival or reinstatement of both of Mamie Lee's policies. The contents of this form, purportedly show an acknowledgement by Mamie Lee Wright that the policies were properly lapsed and that no premiums had been paid on either since March 29, 1971. To this application form the signature "Mamie Wright" was forged, such purported signature being witnessed by the agent Hunter. The form was forwarded to the home office in Charleston where the purported application for revival was rejected on May 20, 1971.

It is the theory and contention of the plaintiff that the insurer formed the design, because of her age and ill health, to fraudulently cancel her policies for alleged non-payment of premiums and that the acts on the part of the insurer and its agents hereinabove set forth were done in furtherance of such fraudulent scheme and design.

■  This Court has consistently adhered to the rule that the breach of a contract, committed with fraudulent intent, and accompanied by a fraudulent act, or acts, will entail liability for punitive as well as actual damages. South Carolina Law Quarterly, Vol. 10, No. 3 (1958), pp. 444-484, *West v. Service Life and Health Insurance Co.,* 220 S. C. 198, 66 S. E. (2d) 816; *Blackmon v. United Insurance Co.,* 233 S. C. 424, 105 S. E. (2d) 521; *Corley v. Coastal States Life Insurance Co.,* 244 S. C. 1, 135 S. E. (2d) 316.

In the case of *Sullivan v. Calhoun,* 117 S. C. 137, 108 S. E. 189, this Court quoted with approval from 12 R. C. L. 229, the following language:

"Fraud assumes so many hues and forms, that courts are compelled to content themselves with comparatively few general rules for its discovery and defeat, and allow the facts and circumstances peculiar to each case to bear heavily upon the conscience and judgment of the court or jury in determining its presence or absence. While it has often been said that fraud cannot be precisely defined, the books contain many definitions, such as unfair dealing; the unlawful appropriation of another's property by design."

We think that the evidence hereinabove recited was quite sufficient, under settled principles of law, to warrant a finding that there was a breach of contract, with fraudulent intent, accompanied by a fraudulent act or acts on the part of the insurer and accordingly sufficient to support a verdict for punitive damages. The insurer argues, *inter alia,* that the breach of contract occurred on May 3, when the policies were reported for lapse to the home office and hence that

any proved fraudulent acts on the part of the insurer were subsequent to and did not accompany the breach. This argument, we think, is clearly without merit. The breach had its inception, of course, on May 3, but, insofar as the plaintiff was concerned, was not completed until May 28 when the insurer first informed her of the cancellation and attempted to obtain from her a receipt or release upon refund of a portion of the money collected from her in recent weeks. As we view it any and all acts in furtherance of the alleged fraudulent scheme, in effect accompanied the breach which did not reach its final culmination until May 28, 1971.

Appellant's second contention is that the trial judge erred in admitting in evidence the aforementioned Multiple Revival Application, upon which the insured's signature was forged. It appears that said application was offered in evidence by the insurer at a prior trial in this action, counsel for the insurer not then knowing that there was any question about the signature of the insured thereon. Upon the trial, from whence this appeal comes, the plaintiff called as a witness a Mr. Bradley, who was assistant manager of the insurer at the Lancaster office, at the pertinent times and through Mr. Bradley identified and subsequently offered in evidence the application. Its admission was objected to on the ground that such had not been properly authenticated since Mr. Bradley "had no personal knowledge of it."

Bradley had no personal knowledge as to the completion of the form or the signature thereon, but did know that the application was handled by Hunter and was handed by Hunter to Bradley in the normal course of the business of the insurer and then processed on to the home office in the usual course. We think this item was sufficiently identified, as being a part and parcel of the transaction on the part of the insurer, to make it properly admissible in evidence. It is well settled that the admission or exclusion of evidence is largely addressed to the sound discretion of the trial judge and that the exercise of his discretion thereabout will not be disturbed in the absence of

an abuse of such discretion amounting to a manifest error of law. It is worthy of mention that the insurer's Lancaster manager, Mr. Jones, later in the trial testified as to the authenticity of Hunter's signature as a witness on the revival application form.

We are not convinced that there was any prejudicial error and the judgment below is,

Affirmed.